This case was originally heard by Deputy Commissioner Nance in Durham on May 16 and 17, 1994. The depositions of Dr. James E. Parker and Dr. Dewitt C. Alfred were taken on June 30, 1994 and July 8, 1994, respectively. Written contentions were received from both parties by September 6, 1994.
The Full Commission has reviewed the prior Decision and Order based upon the record of the proceedings before Deputy Commissioner Nance and upon the briefs and argument of counsel. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Decision and Order and enters the following Decision and Order.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. Stephen Taylor Alt is a citizen and resident of North Carolina and has been at all times relevant to this action.
2. John Umstead Hospital is owned and operated by the state of North Carolina and has been at all times relevant to this action.
3. Plaintiff was committed to John Umstead Hospital on November 30, 1989 for substance abuse treatment for a period of 180 days or until such time as he is otherwise discharged by the hospital.
4. On or about January 26, 1990, plaintiff's involuntary commitment was changed to a voluntary admission.
5. At all times relevant to this action, defendant James E. Parker, MD was a physician licensed and authorized to practice medicine in the State of North Carolina.
6. At all times relevant to this action, defendant James E. Parker, MD was employed as a staff physician at John Umstead Hospital.
7. At all times relevant to this action, Carolyn DeBerry was a licensed registered nurse authorized to practice nursing in the State of North Carolina.
8. At all times relevant to this action, Carolyn DeBerry was employed on the staff of John Umstead Hospital as a registered nurse.
9. At all times pertinent to this action, James E. Parker and Carolyn DeBerry were employed by John Umstead Hospital and were acting within the course and scope of their employment.
10. The plaintiff was known by defendant James E. Parker, MD to have been HIV positive during all times relevant to this matter.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission rejects the findings made by the Deputy Commissioner and makes the following:
FINDINGS OF FACT
1. In October of 1989, plaintiff lost his job one day before his birthday and also received news about a friend who had died. Plaintiff then began drinking heavily and, as an attention-getting ploy, falsely told his brother, Peter Alt, that he had taken an overdose of Tylenol.
2. Plaintiff was involuntarily institutionalized for psychiatric treatment in John Umstead Hospital on 21 November of 1989, being committed by Peter Alt. From his admission until February 22nd, 1990 plaintiff's stay at John Umstead Hospital was unremarkable although he did from time to time exhibit behavior such as using obscenities and storming out of meetings. During the weeks preceding February 22nd, 1990, the Vocational Rehabilitation staff and others at the hospital were working with plaintiff to secure a residence and a job for him in the community. Plaintiff's orderly discharge from the hospital was anticipated.
3. At all times relevant to this case, plaintiff suffered from mixed personality disorder with narcissistic and histrionic features. The narcissistic feature is characterized by the individual having a large ego, a great sense of entitlement, and having little or no concern for the needs of others. The histrionic feature of plaintiff's personality caused dramatic, emotional displays and mood volatility.
4. On the morning of February 22nd, 1990, plaintiff missed an appointment for a job interview. Plaintiff had pneumonia at the time and also had some fears of being embarrassed by the staff person assigned to take him to the interview. Defendant Parker and social worker Carol High were of the opinion that plaintiff intentionally missed his job interview appointment in order to sabotage his discharge.
5. In the afternoon of February 22nd, 1990, plaintiff had a meeting with Dr. Parker and social worker Carol High. At that meeting two issues were discussed. Dr. Parker informed plaintiff of news concerning his HIV status, in particular, his Tcell count. This particular news was devastating to plaintiff, and he was also upset by the fact that Dr. Parker discussed his HIV status with him in the presence of Ms. High. Also at this meeting, Dr. Parker and Ms. High confronted plaintiff with their suspicion that he missed his job interview in order to sabotage his discharge. The meeting ended at approximately 4:00 p.m. with angry words between plaintiff and Dr. Parker and Ms. High. Shortly after the end of the meeting with plaintiff at about 4:00 p.m. on February 22nd, 1990, Dr. Parker wrote a discharge order for plaintiff effective that day. In the progress note accompanying that order, Dr. Parker wrote, "Patient does not appear to be an acute danger to himself or others and did not voice suicidal or homicidal thoughts during the encounter." At about 5:00 p.m. Dr. Parker amended the order for plaintiff's brother to pick him up the following day.
6. Plaintiff did not respect Dr. Parker professionally, and had a poor relationship with other members of the staff. When staff tried to talk to him, plaintiff often talked continuously in a loud voice using graphic obscenities and left rooms kicking objects or slamming doors. Plaintiff often refused to talk to staff members who had less than a doctoral degree, and openly called staff members derogatory names. Plaintiff referred to social worker Carol High as a "the grand bimbo." Plaintiff often called Nurse Carolyn DeBerry "the big fat black bitch."
7. Thereafter, at about 5:25 p.m. on February 22, 1990, plaintiff was handed a dinner tray on the ward. Plaintiff was still upset from his meeting with Dr. Parker and he threw the dinner tray against the wall near the door to the ward. The contents of the tray consisted of plastic plates, cups and utensils, and food. As a result of this spill, the contents of the tray splattered on the wall and floor, making a mess. There was no damage to anyone or anything from the spill, just a clean-up job which was done by Health Care Technician Wallace Bullock. At the time plaintiff threw the tray, the only other people on the ward were Wallace Bullock, the health care technician, and at most, one or two other patients who were at the far end of the ward. Immediately after the tray was thrown, Wallace Bullock called the nurse on duty to report the incident. Also, immediately after the tray was thrown, plaintiff went to his room where he remained for about ten minutes until later taken by Bullock and another health care technician, Harvey Estes, to the seclusion and restraint room.
9. The nurse who responded to the call was Carolyn DeBerry. Upon her arrival on the ward and observation of the scene, Nurse DeBerry ordered plaintiff to be secluded and restrained. In response to the order, Technician Bullock and another health care technician, Harvey Estes, went to plaintiff's room and asked him to come with them to the seclusion room. Plaintiff got up of his own free will and accompanied Health Care Technicians Bullock and Estes from his bedroom on Ward 464 to the seclusion and restraint room on Ward 462. He offered no resistance and was "very cooperative" with the health care technicians.
10. After plaintiff had been taken to seclusion and restraints, Nurse DeBerry called Dr. Parker to get his approval for the seclusion and restraint order. Nurse DeBerry informed Dr. Parker that the tray had been thrown and that she considered plaintiff to be out of control. Dr. Parker was in the admissions office of the hospital at the time of the call. Dr. Parker gave Nurse DeBerry verbal authorization for plaintiff to be secluded and restrained for up to eight hours. Dr. Parker and Nurse DeBerry did not discuss alternatives to the use of seclusion and restraints.
11. Seclusion and restraint is a term referring to a situation in which a patient is placed in a locked room on a bed and the patient's arms and legs are secured to the bed at the corners of the bed by leather straps which are attached to the frame of the bed which in turn is bolted to the floor. This is called four-point restraints. While in four-point restraints, the patient is not able to move his arms or legs. The room is empty except for the bed. While in restraints, the patient cannot sit up, roll over, or get up from the bed in any way. He is also unable to do things such as blow his nose or to monitor his own bathroom needs.
12. Being secluded and restrained in four-point restraints is universally regarded as a negative and demeaning experience. At no time prior to or during the incident of seclusion and restraint on February 22-23, 1990 did plaintiff ever threaten anyone. At no time did he ever assault anyone. At no time did he make any attempt on his own life. At no time during his hospitalization at John Umstead Hospital prior to Feb. 22, was any restrictive intervention such as seclusion and restraint ever used for plaintiff.
13. The use of seclusion and restraints is considered an extreme measure used for the control of violence or suicidal behavior. It should be used only in emergency situations. The standards of practice in the psychiatric profession limit the use of seclusion and restraint to situations where it is necessary 1) to protect others from imminent violence, 2) to protect the patient from suicidal or self-mutilating behaviors, and 3) to prevent serious disruption of the treatment environment by activity such as setting fires or gross destruction of the unit. These standards were in place and in effect in North Carolina in February of 1990. Umstead hospital policy limiting the use of seclusion and restraint follows the same standards.
14. The behavior of plaintiff used by Defendants Parker and DeBerry to justify their use of seclusion and restraint was that plaintiff had thrown a food tray against the wall and that he was "out of control". The specific behavior of plaintiff relied upon by defendants to define plaintiff as "out of control" was that plaintiff shouted insults and obscenities at defendants.
15. This verbal behavior described by defendants as "out of control" was the same behavior exhibited by plaintiff at approximately 4:00 p.m. that day and also described by Defendant Parker in his testimony as "out of control". However, notwithstanding his description of plaintiff's verbal obscenities and storming out of a meeting as "out of control", Defendant Parker wrote an order discharging plaintiff and a progress note stating that plaintiff did not pose an imminent danger to himself or others. He amended but essentially reconfirmed the discharge order at approx. 5:00 p.m.
16. With no further contact whatsoever with his patient, and based only upon a phone call that he received from Nurse DeBerry and without examining his patient, Dr. Parker authorized the seclusion and restraint order for a patient who had never been subjected to seclusion and restraint before, nor who had previously exhibited behavior which would have warranted such a restrictive form of therapy.
17. The decision of Dr. Parker and Nurse DeBerry to place plaintiff into seclusion and restraints at about 5:25 p.m. on February 22nd, 1990 was not in keeping with community standards of medical practice and was not justified by plaintiff's behavior, the state rules, or hospital policies. Throwing a tray and shouting obscenities do not constitute imminent danger to others or to a patient so as to justify the use of seclusion and restraint under psychiatric and medical standards of practice in February 1990. The behavior of Nurse DeBerry, smarting from being called names by her patient and unable to get her patient to be compliant, was one of punishment rather than treatment. Dr. Parker aided and abetted in this punishment. Irrational actions by a psychiatric patient are to be expected, and what might call for punishment in a mentally stable patient does not justify punishment of a mentally deficient patient.
18. The medical purpose of seclusion and restraint is to contain the immediate violence or suicidal behavior and to start to release the patient as soon as the person is not manifesting that behavior. It is consistent with the standards of practice to release a patient from seclusion and restraint once it appears that the patient is calmed down and is no longer a threat to himself or to others.
19. During the first three hours that plaintiff was secluded and restrained, he remained calm. This is reflected not only in the testimony of plaintiff but in the contemporaneous records and notes made by the hospital staff who checked on him every 15 minutes. During that time, plaintiff made several requests to see Dr. Parker. Nurse DeBerry communicated plaintiff's requests to Dr. Parker. However, Dr. Parker did not respond and did not come to see plaintiff.
20. It is consistent with standards of practice and was recommended prior to February 1990 by the American Psychiatric Association Task Force on Seclusion and Restraint that a physician physically see a patient for whom he has ordered seclusion and restraint in absentia, preferably within one hour or definitely within three hours.
21. The failure of Defendants DeBerry and Parker to release plaintiff from four-point restraints during the first three hours of his restraint was a violation of acceptable professional standards. Between 5:30 p.m. when plaintiff was placed into seclusion and restraints and 11:30 p.m. on February 22nd, 1990, Dr. Parker failed to visit or examine plaintiff, notwithstanding the fact that he was aware of plaintiff's several requests to see him and notwithstanding the fact that he was on the grounds of John Umstead Hospital the entire time. Under the facts and circumstances in this case, and having given verbal authorization to Nurse DeBerry to seclude and restrain plaintiff, Dr. Parker should have seen Mr. Alt immediately. His failure to do so within three hours of ordering seclusion and restraint was a departure from accepted standards.
22. In order for plaintiff to be released from seclusion and restraint, Defendants Parker and DeBerry imposed a condition that plaintiff be required to make a verbal contract with Nurse DeBerry that he would be calm. However, plaintiff was not informed of this condition, and at no time while he was secluded and restrained, did plaintiff have an understanding of what was expected or required of him in order to become released.
23. At approximately 11:30 p.m. on February 22nd, 1990, Dr. Parker saw plaintiff very briefly during which time plaintiff cursed Dr. Parker and used obscenities in referring to him. There is no evidence in the record that between 11:30 p.m. and 12:00 midnight on February 22nd Stephen Alt posed a danger to himself or others sufficient to justify a second order of seclusion and restraint.
24. As the result of being restrained as punishment on 22 and 23 February 1990, plaintiff sustained significant mental and emotional damages, including anxiety, depression and a lowered self esteem.
* * * * * * * * * * *
Based on the foregoing findings of fact the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. In order to prevail under the Tort Claims Act, plaintiff must prove negligence on the part of the named state employees arising out of and in the course of their employment. Ayscue v.North Carolina State Highway Commission, 270 N.C. 100 (1967). Dr. Parker and Nurse DeBerry of John Umstead Hospital were negligent in their care of plaintiff Stephen Alt inasmuch as their implementation of seclusion and restraint upon plaintiff on 22 and 23 February 1990 was not reasonable and in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in similar communities in February of 1990. G.S. § 143-291 et seq.
2. Defendant argues that the essential elements of plaintiff's claim under the tort claims act have been determined in Alt v. Parker, 112 N.C. App. 307, 435 S.E.2d 773 (1993) and that plaintiff is collaterally estopped from relitigation of the same issues and facts. We disagree. The issues were not the same. The suit was for malicious prosecution (not involved here), false imprisonment (only collaterally involved, since a hospital and its staff can be not guilty of false imprisonment but guilty of negligence based on the same facts), and deprivation of due process (not involved here). The Industrial Commission is the court of original jurisdiction in state torts claims. G.S. §143-291 etseq. The instant case is the first time the court of original jurisdiction has considered the facts of the instant case. We have found that Nurse DeBerry and Dr. Parker over-reacted to acts of a psychotic patient and, in doing so, did not meet the standard of care for treatment of a mental patient and were negligent in applying restraints.
3. As the result of being negligently restrained on 22 and 23 February 1990, plaintiff sustained mental and emotional damages entitling him to be paid an amount equal to $5,000.00 by defendant as compensation. Id.
* * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
ORDER
1. Defendant shall pay damages in the amount of $5,000.00 to plaintiff as the result of their negligence occurring on 22 and 23 February 1990.
2. Defendant shall pay the costs.
 S/ __________________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ______________________________ COY M. VANCE COMMISSIONER
S/ _______________________________ WILLIAM L. HAIGH CHIEF DEPUTY COMMISSIONER
January 24, 1996
TO: Attorneys for the Parties in TA-12720
FROM: Thomas J. Bolch
The Commission's Electronic Bulletin Board Administrator has brought to my attention that the Findings of Fact in the above Opinion and Award lack a paragraph 8. This is to advise that Paragraph 8 is not missing; paragraphs 9 and subsequent were misnumbered.
 S/ _________________________ THOMAS J. BOLCH COMMISSIONER